Howard Rubinstein (Fla. SBN: 104108)
Attorney at Law
914 Waters Avenue, Suite 20
Aspen, Colorado 81611
Tel.: (832) 715-2788
 *(To apply as counsel pro hac vice)*

Harold M. Hewell (Cal. SBN: 171210)
Hewell Law Firm
402 W. Broadway, Fourth Floor
San Diego, California 92101
Tel: (619) 235-6854 • Fax: (888) 298-0177
E-mail: hmhewell@hewell-lawfirm.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANINE SUGAWARA,** individually and on behalf of all others similarly situated,<br><br>            *Plaintiff,*<br>  vs.<br><br><br><br><br><br><br><br><br><br>**PEPSICO, INC.,** a North Carolina corporation; and **DOES 1** through **10,** inclusive,<br><br>            *Defendants.* | **CASE NO.: 2:08-CV-01335-MCE (JFM)**<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION AND DAMAGES**<br><br><br><br><br><br><br><br><br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff JANINE SUGAWARA, by and through her attorneys, hereby complains and alleges as follows:

## I. PARTIES

1. Ms. Sugawara (hereinafter "Plaintiff"), is an individual consumer who at all times material hereto, was and is a resident of California. For purposes of diversity jurisdiction, she is a "citizen" of California. She respectfully requests a jury trial.

2. Defendant PepsiCo, Inc. ("PepsiCo") is a corporation organized and existing under the laws of the North Carolina with its principal office located at 700 Anderson Hill Road, Purchase, New York 10577. For diversity purposes, PepsiCo may be considered to be a citizen of either North Carolina or New York. PepsiCo merged with The Quaker Oats Company ("Quaker") in 2001, and Quaker is now a unit of PepsiCo. Quaker's products include "Cap'n Crunch® with Crunchberries" ("Product"). At all times relevant hereto, PepsiCo was and is doing business in the county where this judicial district is located.

3. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, the subsidiaries, affiliates and other related entities of PepsiCo were the agents, servants and employees of PepsiCo, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment, and PepsiCo ratified and approved the acts of said agents and employees. Plaintiff also is informed and believes and thereon alleges that at all times herein mentioned, the employees of PepsiCo, its subsidiaries, affiliates and other related entities were the agents, servants and employees of PepsiCo, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment, and that PepsiCo ratified and approved the acts of said agents and employees.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiff Class is a

citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual Class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). The Plaintiff is a citizen of California, whereas, as set forth above, PepsiCo may be considered a citizen of either North Carolina or New York. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiff alleges that more than two-thirds of all of the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than California, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

5. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business within, may be found in, and is subject to personal jurisdiction in this district. The original of the "Declaration of Harold M. Hewell Pursuant to Civil Code §1780(c) of the Consumer Legal Remedies Act, Civil Code §§1750 et seq." regarding venue under the California Consumer Legal Remedies Act was filed as Exhibit "A" to the original Complaint in this action, and is incorporated herein by reference.

### III. GENERAL ALLEGATIONS

6. All allegations in this Complaint are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation or discovery.

7. Whenever reference in this Complaint is made to any act or transaction of PepsiCo, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of PepsiCo committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of PepsiCo while actively engaged in the scope of their duties.

### IV. FACTUAL ALLEGATIONS

8. Defendant PepsiCo manufactures, markets, and promotes the Product

referenced above.

9. In addition to the use of the word "berries" in the Product name, the Product's principal display panel ("PDP") - the portion of the Product box designed to face consumers as they shop in a market aisle - features the Product's namesake, "Cap'n Crunch" thrusting a spoonful of "Crunchberries" at the prospective buyer.

10. The Crunchberries are pieces of cereal in bright fruit colors, shaped to resemble berries. Close inspection reveals that the Crunchberries on the PDP are not really berries, but the colorful Crunchberries, combined with the "berry" in the Product name, conveys only one message: that Cap'n Crunch is not all sugar and starch – it contains redeeming fruit.

11. This message is supplemented and reinforced by marketing which represents, in a matter-of-fact manner: "Crunch Berries is a combination of Crunch biscuits *and colorful red, purple, teal and green berries* (Emphasis added).

12. There can be no other reason for the emphasis on berries than to lead consumers to believe the Product is made with real fruit content. Neither PepsiCo nor Quaker is a novice when it comes to marketing.

13. In truth, however, the Product contains no actual berries of any kind. If the consumer takes the box from the shelf and examines the fine print of the ingredient list, he or she will discover that the only fruit content is a touch of strawberry fruit concentrate – twelfth in order on the ingredient list, just after partially hydrogenated soybean oil and "natural and artificial flavors," and just before malic acid.[1]

14. Natural flavoring provides no nutritional value.[1] The rest of the ingredients are: corn flour, sugar, oat flour, brown sugar, coconut oil, salt, sodium citrate, nonfat dry milk, whey, niacinamide, reduced iron, zinc oxide, yellow 5, red 40, mono and diglycerides, yellow 6, blue 1, thiamin mononitrate, pyridoxine hydrochloride, BHT, riboflavin and folic

---

[1] 21 CFR § 101.22(a)(3). "The term natural flavor or natural flavoring means the essential oil…or fermentation products thereof, whose significant function in food is flavoring rather than nutritional."

acid. True and correct representations of the Product labeling and marketing copy are attached hereto as Exhibit "A" and incorporated by reference herein.

15. Plaintiff contends that Defendant's marketing of the Product in this manner is deceptive and likely to mislead and deceive a "reasonable consumer" such as herself in violation of California statutes and common law causes of action that parallel, and do not conflict with, the labeling requirements established by the Federal Food, Drug, and Cosmetic Act ("FDCA").[2] See California's Sherman Food, Drug, and Cosmetic Law.[3]

16. During the past four years, Plaintiff, at various times purchased the Product, in large part because she had been exposed to advertising and representations of PepsiCo and Quaker as set forth above. She was misled by the packaging and marketing, which by design and intent convey the message that the Product contains real fruit. She trusted the Quaker label because of the company's long history of producing other wholesome breakfast cereals

17. However, Plaintiff has since learned that many popular foods and beverages are marketed as if they are made with fruit, but actually contain little or no fruit at all. The Strategic Alliance for Healthy Food and Activity Environments (hereinafter "Strategic Alliance") has published the results of a study examining the ingredients of widely advertised foods with references to fruit on the packaging. A true and correct copy of the study, annotated to highlight references to the Product, is attached hereto as Exhibit "D" and incorporated by reference.

18. The study concluded, among other things, that despite advertising and packaging that suggests the presence of fruit, more than half of the food products studied –

---

[2] Codified at 21 U.S.C. §§ 301, et seq., with implementing regulations found at 21 C.F.R. §§ 1.1, et seq.

[3] Cal. Health and Safety Code §§ 109875 et seq. (The FDCA labeling regulations also have been incorporated into California law by reference. California Section 110100 of the California Health and Safety Code provides: "All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state.")

including the Product - contain no fruit at all. The study concluded that there is reason to be concerned that current packaging labels and advertising are misleading consumers about the nutritional value of some of the most popular foods and snacks.

19. Plaintiff relied on PepsiCo's marketing representations. Had she known that "Cap'n Crunch® with Crunchberries" contained no fruit, she would not have purchased it. In doing so, was deprived of the benefit of her bargain; the deceptive representations described above cost her money because she received a Product of less value than she paid for it.

### V. CLASS ALLEGATIONS

20. Pursuant to California Civil Code § 1781, California Code of Civil Procedure § 382, and Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of herself and all other California consumers who purchased the Product during the class period, which is defined as the four years preceding the filing of this action. The practices and omissions of PepsiCo were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All putative Class members were and are similarly affected by having purchased and used the above-mentioned Product and the relief sought herein is for the benefit of Plaintiff and members of the putative class.

21. Plaintiff is informed and believes, and on that basis alleges, that the Plaintiff Class is so numerous that joinder of all members would be impracticable. Based on the annual sales of the Product and the popularity of the Product, it is apparent that the number of consumers of the Product, both nationwide and in California alone would at least be in the many tens of thousands, thereby making joinder impossible.

22. Questions of law and fact common to the Plaintiff Class and the subclasses exist that predominate over questions affecting only individual members, including, inter alia, the following:

(a)    Whether Defendant's practices and representations made in connection with the advertising, marketing, promotion, labeling and sales of the Product

1    as set forth herein were deceptive, unlawful or unfair in any respect, thereby

2    violating California's Unfair Competition Law ("UCL), California Bus. & Prof.

3    Code § 17200 et seq.;

4    (b)    Whether Defendant's practices and representations made in connection

5    with the advertising, marketing, promotion, labeling and sales of the Product

6    as set forth herein were deceptive in any respect, thereby violating

7    California's False Advertising Law ("FAL"), California Bus. & Prof. Code §

8    17500 et seq.;

9    (c)    Whether Defendant's practices and representations made in connection

10   with the advertising, marketing, promotion, labeling and sales of the Product

11   as set forth herein were deceptive and/or misleading in any respect;

12   (d)    Whether Defendant breached any implied or express warranties in

13   connection with the practices and representations made in the advertising,

14   marketing, promotion, labeling and sales of the Product as set forth herein,

15   at the expense of and to the detriment of Plaintiff and Class members;

16   (e)    Whether Defendant violated Civil Code §1770(a)(5) et seq. ("CLRA") by the

17   practices and representations made in connection with the advertising,

18   marketing, promotion, labeling and sales of the Product as set forth herein;

19   and

20   (f)    Whether Defendant's conduct as set forth herein injured consumers, and if

21   so, the extent of the injury.

22   23. The claims asserted by Plaintiff in this action are typical of the claims of the

23   members of the Plaintiff Class and all subclasses as described herein, the claims arise from

24   the same course of conduct by PepsiCo, and the relief sought is common.

25   24. Plaintiff will fairly and adequately represent and protect the interests of the

26   members of the Plaintiff Class and all subclasses. Plaintiff has retained counsel competent

27   and experienced in both consumer protection and class action litigation.

28   25. Certification of this class action is appropriate under FRCP 23(b) and California

Code of Civil Procedure § 382, and California Civil Code § 1781, because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other Class member would be able to protect their own interests, because the cost of litigation through individual lawsuits might exceed expected recovery. Certification also is appropriate because PepsiCo acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole. Further, given the large number of consumers of the Product, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

26. A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that it would not be practicable to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI. FIRST CAUSE OF ACTION

### (Cal. Bus. & Prof. Code § 17200, et seq.)

27. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

28. This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to California Bus. & Prof. Code § 17200, et seq., which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited

by Chapter 1 (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

29. Plaintiff alleges that PepsiCo committed the unlawful, unfair, and deceptive practices set forth above in this First Amended Complaint.

30. These practices offend public policy, are unconscionable, are oppressive and unscrupulous, and cause substantial injury to consumers.

31. The acts and concealment of material facts, as described in this First Amended Complaint, have a capacity, tendency or likelihood to deceive or confuse the "reasonable consumer" regarding the contents and nutritional value of the Product.

32. Plaintiff alleges that PepsiCo committed an unfair business act or practice as set forth above. The utility of PepsiCo's misleading and/or deceptive advertising, promotion, labeling and/or marketing for the purpose of selling the Product is negligible, if any, when weighed against the extent of harm to the general public, Plaintiff and Class members. The harmful impact upon members of the general public and the Class who were and are misled and deceived with respect to PepsiCo's advertising, promotion, marketing and labeling of the Product far outweighs any reasons or justifications by PepsiCo for engaging in these practices. As alleged in this First Amended Complaint, PepsiCo had an improper motive (profit over truthful advertising, promotion, labeling and marketing) in misrepresenting and/or omitting the nature of the Product in its advertising, promotion, marketing and labeling. These deceptive and misleading practices were and are under the sole control of PepsiCo, and they were deceptively hidden from members of the general public in PepsiCo's advertising, promotion, marketing and labeling of the Product.

33. As a purchaser of the Product, and as a member of the general public in California who has been injured by PepsiCo's unlawful and/or unfair practices, Plaintiff is entitled to and does bring this class action seeking all available remedies under California's Unfair Competition Law, including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

34. PepsiCo committed a deceptive act or practice by making written and oral

material representations and omissions as set forth above that have a capacity, tendency, or likelihood to deceive or confuse a reasonable consumer as to the Product's actual nature, as described above.

35. The violations of the CLRA, set forth in detail below, constitute a predicate violation of the UCL's "unlawful prong," and substantiate the deception inherent in the representations made by PepsiCo.

36. The unfair, deceptive and/or unlawful acts and practices of PepsiCo, as alleged in this First Amended Complaint, present a threat to members of the general public in that PepsiCo is able to carry on this scheme of misrepresentation and omission without consequence.

37. Plaintiff alleges that PepsiCo continues these unfair, deceptive and/or unlawful business practices described herein.

38. PepsiCo's acts, misrepresentations, concealment of material facts, and failures to disclose as alleged in this First Amended Complaint, constitute unfair, deceptive and/or unlawful business practices within the meaning of the California Bus. & Prof. Code § 17200, et seq. Plaintiff and members of the general public were, and are likely to be deceived by PepsiCo's scheme to misrepresent the fruit content of the Product, as alleged in this First Amended Complaint.

39. Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself and members of the general public, seeks an order of this Court:

(a)     Enjoining PepsiCo from continuing to engage, use, or employ any business practice found by this Court to be unfair, deceptive and/or unlawful under the UCL; and

(b)     Restoring all monies that may have been acquired by PepsiCo as a result of such unlawful, unfair, or deceptive act or practices.

40. Plaintiff and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair, deceptive and/or unlawful acts and practices of PepsiCo, as described above, present a

serious threat to Plaintiff and members of the general public.

41. As a result of PepsiCo's violation of the UCL, Plaintiff and the Class are entitled to restitution for out-of-pocket expenses and economic harm suffered.

42. Pursuant to Civil Code § 3287(a), Plaintiff and the Class are further entitled to pre-judgment interest as a direct and proximate result of PepsiCo's wrongful conduct. The amount of damages suffered by Plaintiff and the Class as a result of said acts is a sum certain and capable of calculation and Plaintiff and Class members are entitled to interest in an amount to be set forth according to proof.

## VII. SECOND CAUSE OF ACTION

### (Cal. Bus. & Prof. Code §17500, et seq.)

43. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

44. In violation of California Bus & Prof. Code § 17500, PepsiCo has disseminated, or caused to be disseminated, deceptive and misleading statements in advertisements, promotion labeling and/or marketing for the Product as set forth above.

45. PepsiCo's representations in the advertisements, promotions, labeling and/or marketing of the Product are deceptive and misleading because the Product contains only nominal fruit content.

46. Plaintiff alleges that PepsiCo continues to disseminate, or cause to be disseminated, the deceptive and misleading representations described herein.

47. PepsiCo is disseminating representations about the Product, which by their very nature are deceptive and misleading within the meaning of California Bus. & Prof. Code §17500, et seq. Such representations are likely to deceive a reasonable consumer and present a continuing threat to the general public; they will continue to mislead consumers into purchasing the Product on deceptive premises. The violations of the CLRA, set forth in detail below, constitute a predicate violation of the FAL as alleged herein and substantiate the deception inherent in the representations made by PepsiCo.

48. In making and disseminating the representations alleged herein, PepsiCo knew

or should have known that they were deceptive and misleading, and it acted in violation of California Bus. & Prof. Code § 17500, et seq.

49. As a direct and proximate result of PepsiCo's wrongful conduct, Plaintiff and the Class members have suffered substantial monetary and non-monetary damage. Pursuant to California Business and Professions Code § 17535, Plaintiff, on behalf of themselves and members of the general public, seek an order of this Court:

(a)   Enjoining PepsiCo from continuing to engage, use, or employ any business practice this Court finds to be in violation of the FAL; and

(b)   Restoring all monies that may have been acquired by means of PepsiCo's deceptive and misleading statements described herein.

50. If PepsiCo's conduct is not enjoined, Plaintiff and the members of the Class will continue to be damaged by PepsiCo's deceptive and misleading advertising.

51. Pursuant to Civil Code § 3287(a), Plaintiff and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of PepsiCo's wrongful conduct. The amount of funds paid by Plaintiff and Class members as a result of said acts was a sum certain and capable of calculation, and Plaintiff and Class members are entitled to interest in an amount to be set forth according to proof.

## VIII. THIRD CAUSE OF ACTION

### (Intentional Misrepresentation)

52. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

53. PepsiCo has represented to the public, including Plaintiff, by packaging, advertising, labeling and other means that the Product has characteristics, ingredients, and qualities that it does not have, as set forth in detail above and incorporated herein. Plaintiff and each Class member were exposed to these representations each time they purchased the Product at the point of sale for each purchase of the Product.

54. PepsiCo's representations were deceptive in that the Product contains no fruit content of any nutritional value.

55. At the time PepsiCo made the representations herein alleged, PepsiCo knew the representations were deceptive.

56. PepsiCo intentionally made the representations above for the purpose of deceiving Plaintiff and Class members into purchasing a product that is not what it is represented to be, thereby depriving them of the benefit of their bargain.

57. Plaintiff and Class members reasonably relied upon Defendant's representations as set forth above, because they believed Defendant and Quaker to be reputable companies.

58. As a proximate result of these acts, Plaintiff and other consumers were induced to spend an amount of money to be determined at trial on the Product; the deceptive representations described above cost them money because they received a Product of less value than they paid for it, a product they would not had purchased but for the misrepresentations.

59. Plaintiff and other consumers, in purchasing, using, and consuming the Product as herein alleged, relied upon PepsiCo's above representations, all to their damage as hereinabove alleged. In doing the things aforementioned, PepsiCo was guilty of malice, oppression, and fraud, and Plaintiff and Class members are, therefore, entitled to recover exemplary or punitive damages.

## IX. FOURTH CAUSE OF ACTION

### (Breach of Express Warranty)

60. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

61. Defendant made and continues to make express warranties for the Product as described in detail above and incorporated herein, including but not limited to the statement that the Product contains berries.

62. As stated herein, the Product contains only nominal fruit content of no nutritional value. This constitutes a breach of express warranties based on all laws that support the express warranty claims by Plaintiff and other Class members. These laws

1   include but are not limited to California Common Law, the California Uniform Commercial

2   Code and California Civil Code section 1790 et seq. (California's Song-Beverly Act).

3       63. The failure of the Product to be as expressly warranted by Defendant has

4   caused Plaintiff and Class members damages as herein described, in that, among other

5   things, they were induced to spend an amount of money to be determined at trial on the

6   Product; the breach of express warranties described above cost them money because they

7   received a Product of less value than they paid for it, a product they would not had

8   purchased but for the express warranties.

9       64. Plaintiff gave timely notice to Defendant of this breach on behalf of themselves

10  and all members of Plaintiff Classes either directly, or indirectly, including upon the filing

11  of the original complaint and the mailing of the CLRA notice letter described below.

12  Plaintiff could not return the Product to Defendant for correction as the defect was

13  irreparable.

## X. FIFTH CAUSE OF ACTION

### (Breach of Implied Warranty)

16      65. Plaintiff realleges and incorporates by reference the allegations set forth in each

17  of the preceding paragraphs of this First Amended Complaint.

18      66. PepsiCo represented to consumers, including Plaintiff and other Class members,

19  by packaging, advertising, labeling and other means described in detail above and

20  incorporated herein, that the Product was a substantially fruit-based product deriving

21  nutritional value from fruit.

22      67. PepsiCo is a merchant of food products, and knew the qualities sought in the

23  Product by Plaintiff and Class members; there was in the sale of the Product an implied

24  warranty that the goods were merchantable and fit for the purpose they were sought.

25      68. PepsiCo breached the warranties implied in the contract for sale of the Product

26  as it does not have the characteristics, qualities, and uses represented by Defendant and

27  sought by Plaintiff and Class members. In fact, the Product contains only nominal fruit

28  content of no nutritional value, as set forth above.

69. As a result thereof, Plaintiff and other consumers did not receive goods as impliedly warranted by PepsiCo.

70. As a proximate result of these breaches of warranty by PepsiCo, Plaintiff and Class members suffered damages in an amount to be determined at trial, in that, among other things, they were induced to spend an amount of money on the Product; the breach of implied warranties described above cost them money because they received a Product of less value than they paid for it, a product they would not had purchased but for the express warranties.

## XI. SIXTH CAUSE OF ACTION:

### (Consumers Legal Remedies Act)

71. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

72. This cause of action is brought pursuant to the CLRA.

73. Plaintiff and each member of the Class are "consumers" within the meaning of Civil Code §1761(d).

74. The purchases of the Product by Plaintiff and each member of the Class were and are "transactions" within the meaning of Civil Code §1761(e).

75. PepsiCo's marketing, promotion, and sales of the Product within California, as alleged herein, violated and continues to violate the CLRA in at least the following respects as set forth in detail above:

(a)     In violation of Civil Code §1770(a)(2), PepsiCo misrepresented the composition or contents of the Product;

(b)     In violation of Civil Code §1770(a)(5), PepsiCo represented that the Product has characteristics, ingredients, uses, and benefits which it does not have;

(c)     In violation of Civil Code §1770(a)(7), PepsiCo represented that the Product is of a particular standard, quality, or grade, which it is not; and

(d)     In violation of Civil Code §1770(a)(9), PepsiCo advertised the Product with an intent not to sell the Product as advertised.

76. Plaintiff seeks and is entitled to equitable relief in the form of an order:

(a)    Enjoining PepsiCo from continuing to engage in any practice determined by this Court to violate the CLRA;

(b)    Requiring PepsiCo to make full restitution of all monies wrongfully obtained as a result of the conduct described above;

(c)    Requiring PepsiCo to disgorge all ill-gotten gains flowing from the conduct described above; and

(d)    Enjoining PepsiCo from such deceptive business practices in the future.

77. Pursuant to the requirements of the CLRA, Plaintiff, by and through counsel, notified PepsiCo in writing of the particular violations of Section 1770 of the CLRA and demanded certain corrective actions. Plaintiff sent that notice by certified mail, return-receipt requested. PepsiCo failed to respond to Plaintiff's demand within thirty days of that letter, and pursuant to section 1782 of the CLRA, Plaintiff amends this pleading to request statutory damages, actual damages, plus punitive damages, interest and attorneys' fees.

78. Regardless of an award of damages, however, Plaintiff also seeks and is entitled to, pursuant to Section 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## XII. PRAYER FOR RELIEF

## (AGAINST ALL DEFENDANTS)

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, and for members of the general public, prays for relief as follows:

1. For an order certifying that this action may be maintained as a class action.

2. For an award of equitable relief:

(a)    Enjoining Defendant from engaging in acts and/or practices determined by this Court to be in violation of the UCL, the FAL and/or the CLRA;

(b)    Requiring Defendant to make full restitution of all monies obtained as a result of any act and/or practice determined by this Court to be in

violation of the UCL, the FAL and/or the CLRA; and

       (c)     Requiring Defendant to disgorge all ill-gotten gains flowing from any act and/or practice determined by this Court to be in violation of the UCL, the FAL and/or the CLRA.

3. For actual and punitive damages under the CLRA in an amount to be proven at trial, including any damages as may be provided for by statute.

4. For an award of attorney's fees pursuant to, inter alia, Section 1780(d) of the CLRA and Code of Civil Procedure § 1021.5.

5. For actual damages in an amount to be determined at trial for the Third, Fourth, and Fifth Causes of Action.

6. For punitive damages in an amount to be determined at trial for the Third Cause of Action.

7. For an award of costs and any other relief the Court might deem appropriate.

8. For pre- and post-judgment interest on any amounts awarded.

                   HEWELL LAW FIRM

Dated: September 23, 2008       /s/ Harold M. Hewell
                         Harold M. Hewell

# EXHIBIT LIST

| EXHIBIT | PAGES |
|---|---|

**Exhibit "A":**
Product and marketing representations.          A - 20 through A - 23

**Exhibit "B":**
Study by the Prevention Institute, published by          B - 25 through B - 31
The Strategic Alliance for Healthy Food and
Activity Environments (annotated).

Exhibit "A"



# Cap'n Crunch®



Quaker Cap'n Crunch ® was introduced in 1963 and has become one of the most successful pre-sweet ready-to-eat cereals ever launched. Today, Cap'n Crunch is the #1 pre-sweetened kids cereal in the U.S.

Cap'n Crunch has a unique, indescribable taste, with deliciously crunchy, sweet biscuits both kids and adults love. Cap'n Crunch is also available in several other delicious varieties. Crunch Berries is a combination of Crunch biscuits and colorful red, purple, teal and green berries. Peanut Butter Crunch has a sweet peanut butter flavor along with the brand's trademark crunchy texture. The newest cereal in the line is Oops! ChocoDonuts, a chocolate donut flavored and shaped cereal with multi-colored sprinkles.

## learn more about Cap'n Crunch®

Visit the Cap'n Crunch® web site:
- http://www.capncrunch.com

Varieties/Flavors:
- Cap'n Crunch® (8oz, 12oz, 16oz, 22oz)
- Cap'n Crunch® Crunchberries (15oz, 21oz)
- Cap'n Crunch® Peanut Butter Crunch (15oz, 20.7oz)
- Cap'n Crunch® Oops! ChocoDonuts (13oz)

Availability:
- Cap'n Crunch is available throughout the United States and Canada.

TO CLOSE • INSERT TAB

653-66



# CAP'N CRUNCH'S
# CRUNCH
# BERRIES

SWEETENED CORN & OAT CEREAL

Find Jean LaFoote with

## Glow in The Dark

### Maze On Back!

NET WT 15 OZ • 425 g

ENLARGED TO SHOW TEXTURE

**Nutrition Facts**
Serving Size 3/4 cup (26g)
Servings Per Container about 16

| Amount Per Serving | Cereal Alone | with 1/2 Cup Vitamin A&D Fortified Skim Milk |
|---|---|---|
| Calories | 100 | 140 |
| Calories from Fat | 15 | 15 |
| | **% Daily Value**\* | |
| Total Fat 1.5g\* | 2% | 2% |
| Saturated Fat 1g | 5% | 6% |
| Trans Fat 0g | | |
| Cholesterol 0mg | 0% | 1% |
| Sodium 180mg | 8% | 10% |
| Potassium 50mg | 1% | 7% |
| Total Carbohydrate 22g | 7% | 9% |
| Dietary Fiber 1g | 3% | 3% |
| Sugars 12g | | |
| Other Carbohydrate 9g | | |
| Protein 1g | | |
| Vitamin A | 0% | 4% |
| Vitamin C | 0% | 0% |
| Calcium | 0% | 15% |
| Iron | 25% | 25% |
| Thiamin | 25% | 30% |
| Riboflavin | 25% | 40% |
| Niacin | 25% | 25% |
| Vitamin B6 | 25% | 25% |
| Folic Acid | 100% | 100% |
| Zinc | 25% | 30% |

\*Amount in Cereal. One half cup skim milk contributes an additional 65mg Sodium, 200mg Potassium, 6g Total Carbohydrate (6g Sugars), and 4g Protein.

\*Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Sat Fat | Less than | 20g | 25g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Corn flour, sugar, oat flour, brown sugar, coconut oil, salt, sodium citrate, nonfat dry milk, whey, partially hydrogenated soybean oil\*\*, natural and artificial flavors, strawberry juice concentrate, malic acid, niacinamide\*, reduced iron, zinc oxide, yellow 5, red 40, mono and diglycerides, yellow 6, blue 1, thiamin mononitrate\*, pyridoxine hydrochloride\*, BHT (a preservative), riboflavin\*, folic acid\*

\*One of the B vitamins
\*\*Adds a dietarily insignificant amount of trans fat

**CONTAINS MILK INGREDIENTS.**

DISTRIBUTED BY:
THE QUAKER OATS COMPANY
P.O. BOX 049003
CHICAGO, IL 60604-9003 U.S.A.

**Questions or Comments?**
Call 1-800-234-6281
Please have package available when calling.
Visit us at www.capncrunch.com
©2006 The Quaker Oats Company





# CAP'N CRUNCH'S
# CRUNCH BERRIES

SWEETENED CORN & OAT CEREAL



0 30000 06560 0



5330953  10/06

GRAPHIC PACKAGING

73773_1



Exhibit "A", page 22 of 31



Exhibit "B"

# WHERE'S THE FRUIT?

## Fruit Content of the Most Highly-Advertised Children's Food and Beverages

This document was prepared by Prevention Institute
Principal authors:

Leslie Mikkelsen, RD, MPH

Caitlin Merlo, BS

Virginia Lee, MPH

Carol Chao, BA

© January 2007

Prevention Institute is a nonprofit, national center dedicated to improving community health and well-being by building momentum for effective primary prevention. Primary prevention means taking action to build resilience and to prevent problems before they occur.  The Institute's work is characterized by a strong commitment to community participation and promotion of equitable health outcomes among all social and economic groups.  Since its founding in 1997, the organization has focused on injury and violence prevention, traffic safety, health disparities, nutrition and physical activity, and youth development.  This, and other Prevention Institute documents, are available at no cost on our website.

265 29th Street
Oakland, CA 94611
510.444.7738
fax  510.663.1280

www.preventioninstitute.org



# WHERE'S THE FRUIT?

## Fruit Content of the Most Highly-Advertised Children's Food and Beverages

### INTRODUCTION

Surveys of children's food habits reveal a disturbing trend over the last 60 years. Up to 80% of today's young children have diets that are considered "poor" or "in need of improvement" (Nestle, 2006). Children are consuming less than the daily recommended servings of fruits, vegetables and whole grains, while consuming excess calories in the form of added sugars and fats (IOM, 2006). The appearance of Type II diabetes (formerly known as adult-onset diabetes) in adolescents and younger children has sounded an alarm around the country that ensuring a good diet (and regular physical activity) for children is a public health priority. Establishing good dietary habits in childhood promotes healthy growth and development and helps prevent diabetes, cardiovascular disease and cancer in adulthood.

Parents are concerned about their children's health and try to make healthful food choices for their children, frequently operating under time and financial pressures. They scan the supermarket aisles, often with children in tow, looking for affordable, tasty and nutritious items to feed their families. Today's large supermarkets may display as many as 40,000 products, so these choices can be daunting (Nestle, 2006). The information contained on product packages is one source of information for these choices, augmented by marketing messages encountered before entering the supermarket.

Parents are not the only targets of these marketing messages. Children are seen as prime marketing targets for their direct purchasing power, influence on parental and households purchases, and to cultivate early brand loyalty that will influence their purchases as adults. An



STUDY PRODUCTS

estimated $10 billion per year is spent for food and beverage marketing to children and youth in the United States (IOM, 2006). This amounts to more than $1 million spent every hour of every day. The majority of these food and beverage products are high in sugar, salt, fat, and calories and low in nutrients (IOM, 2006). After being exposed to marketing messages, children may ask their parents to purchase these products at the supermarket. In fact, children influence household purchase decisions at an estimated value of $500 billion annually for 2 to 14 year olds (IOM, 2006).

In order to attract children, advertising and packages tend to be dynamic, brightly colored and frequently include a branded fictional character or familiar children's icon. While taste and fun are the primary appeals to children, good nutrition is valued by parents. Although specific health claims and nutrient content claims are regulated by the Food and Drug Administration (FDA), there are still many phrases food and beverage manufacturers include on packages that potentially mislead par-

ents. Terms such as high-energy, low-fat, multi-grain, all natural, or fruit-flavored connote a healthy aura, and regularly appear on highly-advertised products such as breakfast cereals, fruit drinks and children's snacks. It requires some working knowledge of nutrition to read the ingredients list and nutrition facts panel to realize these products are frequently high in added sweeteners and contain very little of the whole grains, fruits and vegetables and low-fat dairy products recommended by the US Dietary Guidelines.

Parents may have difficulty making healthy choices for their children because the advertising and packaging does not clearly represent the product's contents. This study focuses on one aspect of this parental challenge—products linked with fruit, via pictures or references to fruit in the product name or phrases on the label. Fruit is a healthy food for snacks and mealtime, rich in dietary fiber, vitamins and minerals, and children need a recommended two to four servings per day (AAP, 2001). The purpose of this study was to determine whether indications of fruit on the packaging of the most heavily marketed products to children represented actual fruit in the product. We also calculated the proportion of sugar in these products, as one proxy for the overall nutritional value.

## METHODS

We used the list of brands included in the Kaiser Family Foundation's recent study, *It's Child's Play: Advergaming and the Online Marketing of Food to Children* that were identified as the top-spending children's food advertisers on TV (Moore, 2006). Ninety-six brand-name products were identified by the Kaiser Family Foundation study, grouped according to food categories. We excluded 26 items from our study. The excluded items included brand-name products that clearly did not contain fruit (e.g., Pringles, Doritos, Kraft Macaroni & Cheese, and Coca-Cola). We also excluded restaurants since we based our study on products that are available in supermarkets.

The remaining 70 branded products were included in the study. We visited a local grocery store and reviewed the packaging for the 70 items and identified the brands that contained words and images on the package related to fruit and/or fruit ingredients. Of the 70 branded products we reviewed, 37 had references to fruit on the packaging.

These 37 products were the focus of our study. We used the ingredient list to determine whether the item contained fruit, the form of the fruit, and the types of sugar in the product. The percentage of calories from sugars was calculated for each product based on information provided on the Nutrition Facts label, and we reviewed the ingredients panel (see box below) to identify all the added sweeteners. For products that contained fruit, we contacted the manufacturers to learn how much fruit was contained in a serving. The manufacturers considered the actual amount of fruit ingredients used to be confidential (proprietary) information. Therefore we were not able to report on the amount of fruit contained in the products. We also examined the references to fruit on the packages, which included both words and pictures.

---

### FOOD LABELS FOR TWO STUDY BRANDS
*Sugars are highlighted in bold*

**Apple Cinnamon Cheerios:** Whole grain oats, **sugar**, **brown sugar**, cornmeal, corn starch, **corn syrup**, *dried apple pieces*, canola and/or rice bran oil, calcium carbonate, salt, cinnamon, trisodium phosphate, zinc, and iron, vitamin C, a B vitamin, artificial flavor, vitamin B6, vitamin B2, vitamin B1, vitamin A, a B vitamin, vitamin B12, vitamin D, wheat starch, vitamin E



**Strawberry Splash Yoplait Go-Gurt Yogurt:** Cultured pasteurized grade A milk, **sugar**, **high fructose corn syrup**, nonfat milk, modified corn starch, kosher gelatin, tricalcium phosphate, natural and artificial flavor, potassium sorbate, carrageenan, red #40, blue #1



---

## TABLE 1. FRUIT CONTENT BY BRAND

| Category | # of Products | % of Total Products | Brands |
|---|---|---|---|
| Fruit | 10 | 27% | Apple Cinnamon Cheerios, Apple Jacks, Berry Burst Cheerios (*Strawberry Banana, Triple Berry*), Eggo Waffles (*Apple Cinnamon, Blueberry, Strawberry*), Kellogg's Pop Tarts (*Strawberry*), Quaker Chewy 90 Calorie Granola Bars (*Baked Apple*), Smucker's Jam (*Strawberry*), Fruit by the Foot (*Strawberry*), Fruit Rollups (*Strawberry*), Gushers Fruit Snack (*Strawberry*) |
| 100% Fruit Juice | 2 | 6 % | Capri Sun Fruit Waves (*Grape*), Juicy Juice |
| Minimal Fruit | 6 | 16% | **5% Juice Drink**: Sunny Delight Fruit Drinks **10% Juice Drink**: Capri Sun Juice Drink (*Strawberry*), Hi-C Fruit Drinks (*Boppin' Strawberry*), Kool-Aid Jammers **Food Products**: Popsicle (*Orange, Cherry, Grape*), Skittles |
| No Fruit | 19 | 51% | **Beverages**: Nestle Nesquick Milk and Drink Mix (*Strawberry*), Tang **Food Products**: Air Heads, Berry Berry Kix, Bubble Tape, Captain Crunch with Crunch Berries, Dannon Danimals XL (*Strawberry Explosion*), Froot Loops, Fruity Cheerios, Juicy Fruit Gum, Life Savers (*Wild Cherry*), Post Fruity Pebbles, Push Pop (*Cherry*), Ring Pop (*Cherry*), Starbursts, Trix Cereal, Trix Yogurt (*Strawberry Kiwi*), Twizzlers, Yoplait Go-Gurt Yogurt (Strawberry Splash) |

## RESULTS

### Fruit Content

We sorted the 37 products into four categories based on the type of fruit ingredient they contained:

1. **Fruit:** including fruit and fruit from concentrate
2. **100% Fruit Juice**
3. **Minimal Fruit Juice:** drinks containing 2–10% fruit juice (no brands contained 11-99% juice), products containing fruit juice
4. **No Fruit:** including products with no fruit, with only natural fruit flavors [which have no nutritional value (21CFR101.22)], or fruit juice concentrate (which is classified as an added sweetener) (USD–HHS, 2005).

Ten products (27%) contained fruit and two (6%) contained 100% fruit juice. The remaining 25 products (67%) contained no or minimal fruit. Table 1 summarizes the results.

### Sugar Content

Most of the products had at least two forms of added sugars, usually high fructose corn syrup/corn syrup and sugar. In the **Fruit** category, there was a wide range of percentage of calories from sugar, with Eggo Waffles having the lowest percentage and Smucker's Jam having the highest. Fruit Juice is high in naturally occurring sugars, and the **100% Juice** products averaged 89% of calories from sugar. The juice drinks in the **Minimal Fruit** category contained high fructose corn syrup and fruit concentrates and three of the four products had 100% of the calories from sugar.

**100% FRUIT JUICE** does not contain the equivalent fiber, vitamins, and minerals of whole fruit. The American Academy of Pediatrics (AAP), and the US Dietary Guidelines recommends that children be encouraged to eat whole fruits to meet their recommended daily fruit intake. If fruit juice is consumed, they recommend only 100% juice and that intake is limited to 4 to 12 oz. per day, depending on age (AAP, USDHHS).

| PERCENTAGE OF CALORIES FROM SUGAR | | |
|---|---|---|
| Category | Range (%) | Median (%) |
| Fruit (10 products) . . . . . . . . . . . | 14-96 | 46 . . . |
| 100% Fruit Juice (2 products). . . | 86-92 | 89 . . . |
| Minimal Fruit (6 products) | | |
|   2 to 10% juice (4 products) . . | 90-100 | 100. . . |
|   Food (2 products) . . . . . . . . . . | 70-75 | 72 . . . |
| No Fruit (19 products) . . . . . . . | 32-100 | 62 . . . |

| PERCENTAGE OF CALORIES FROM SUGAR FOR SELECTED PRODUCT TYPES | | |
|---|---|---|
| Category | Range (%) | Average (%) |
| Cereals (9 products) . . . . . . . . | 32-50 | 41. . . . |
| Fruit Drinks (8 products). . . . . | 86-100. | 95. . . . |
| Fruit Roll-up type product (2 products) . . . . . . . . . . . . . | 50-58 | 54. . . . |
| Yogurt (3 products) . . . . . . . . | 55-68 | 61 . . . |

**No Fruit** products generally had two or more forms of added sugars in the ingredient list, including high fructose corn syrup.

## The Packaging

Many of the foods in this study had brightly colored packages containing images of fruits and/or words related to fruits regardless of the actual content of fruit ingredients.

Of the 19 products that contained no fruit ingredients, 12 made two references to fruit, six had one reference to fruit, and one had three references to fruit. References to fruit included: pictures of fruit, use of the word "fruit" or "fruity" in the product name and/or description, advertising "fruit flavors" on the package, and using the name of a fruit to describe the product's flavor (i.e., "strawberry kiwi" yogurt and "wild cherry" lifesavers).

For example, the box for *Berry Berry Kix* cereal uses



an image of a cluster of several types of fruit above the letter "i" in Kix, the words "Natural Fruit Flavors," and a photo of a large spoonful of the cereal which includes clusters that appear to be raspberries and blackberries. The list of ingredients reveals that there are no fruit ingredients in this product besides natural fruit flavors, which, as noted above, have no nutritional value.

*Hi-C's Boppin' Strawberry Drink* boxes show images of whole strawberries skimming above a stream of fuchsia colored liquid and use the phrase "made with

real fruit juice" on the package. The Nutrition Facts panel states that the beverage is only 10% fruit juice and high fructose corn syrup and sugar are listed before the juice ingredients. *Capri Sun*, also features pictures of strawberries floating in a stream, and includes the statements "All Natural," "Strawberry" in large yellow and red highlighted text. "Strawberry Flavored Juice Blend" appears in much smaller, black letters. The phrase "10% Fruit Juice" only appears at the top of the Nutrition Facts panel on the side of the box.

Three fruit snack products—*Fruit by the Foot, Fruit Roll-ups,* and *Fruit Gushers*—



all state "Strawberry" in large letters on the label and the phrase "Fruit Flavored Snacks." Pears or grape from concentrate are the first ingredient for all of these products. Yet the absence of dietary fiber, the listing of sugar and corn syrup as the second and third ingredients, and the average 50% calories from sugar imply there is very little real fruit in the product.

## DISCUSSION

We found that nearly two-thirds of highly-advertised children's food products with images or references to fruit on the package contained little or no fruit and were high in added sweeteners. The packages might lead a parent to believe they are a healthier option for their children, when many do not actually deliver any of the nutritional benefits of whole fruit. With the

exception of a few products, children are not benefiting nutritionally from these highly-advertised products.

Only two out of the six beverages in the study contained 100% fruit juice. The remaining four products were primarily water and added sweeteners. As noted above, without a careful reading of detailed nutrition panels on the side of the package, it is not readily apparent that these products barely contain fruit juice. These products are calorie vehicles without any nutritional benefits, and there is a growing body of research that sweetened beverage consumption is associated with excess weight gain in children (Ludwig, 2001). One recent study found that low-income preschool children, who were already at risk to be overweight, were twice as likely to become overweight with the consumption of sweetened beverages (including drinks such as vitamin C-containing juices, other juices, fruit drinks, and soda) (Welsh, 2005).

Most of the food products in this study were high in added sweeteners. Adding sugar is a cheap way for food manufacturers to make food taste good (Brownell, 2004). Young children consume added sugars at well above recommended levels, and adolescents are consuming about double the recommended amounts of added sugars in their diets (IOM, 2006).

## CONCLUSION

There is reason to be concerned that current package labels and advertising are misleading parents and children. The Dietary Guidelines for Americans include fruit as an important part of a nutritionally-balanced diet. It is not the image of fruit, but actual fruit that is healthy for children. The packaging of these products reminds people of fruit and its nutritional value without delivering the benefits. Health conscious parents may be drawn to products that seem healthier for their children, but even parents who read labels may have a hard time identifying actual fruit content and determining the amount of sugar since added sweeteners are often listed under different names. Parents may find difficulty in making sense of the misleading messages displayed on children's food products. Parents deserve, and public health impera-

tives require, packaging that does not mislead consumers into thinking they are making healthy choices.

Food manufacturers can clear up this confusion by removing misleading images and statements from packaging such as allusions to fruit in products that contain little or no fruit, discontinuing advertising of highly-sweetened foods and beverages to children, and reformulating existing food and beverages to both significantly decrease added sweeteners and increase fruits, vegetables and whole grains.

The findings of this study also suggest that there may be an important role for government regulation. Current FDA regulations on health claims and product definitions such as those for fruit drinks are not sufficiently protecting parents and children; these regulations need to be updated to ensure the packaging clearly states fruit content on the cover. Further, parents and children would be assisted by requiring that added dietary sugars be included on the nutrition facts panel, so they can better understand how much sweetener is in these products.

## WORKS CITED

AAP (American Academy of Pediatrics) Committee on Nutrition (2001). The use and misuse of fruit juice in pediatrics. *Pediatrics, 107* (5), 1210-1213.

Brownell K.D., Horgen K.B. (2004). *Food fight: The inside story of the food industry, america's obesity crisis and what we can do about it.* New York: McGraw-Hill.

Institute of Medicine (2006). *Food marketing to children and youth: Threat or opportunity?* Washington, DC: The National Academy Press.

Ludwig D.S., Peterson K.E., Gortmaker S.L. (2001). Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis. *Lancet, 357,* 505-508.

Moore, E.S. (2006). It's child's play: Advergaming and the online marketing of food to children. *A Kaiser Family Foundation Report.* Menlo Park, California: Kaiser Family Foundation. Retrieved December 12, 2006, from www.kff.org/entmedia/upload/7536.pdf.

Nestle, M. (2006) *What to eat: An aisle-by-aisle guide to savvy food choices and good eating.* New York: North Point Press.

U.S.D.H.H.S. (United States Department of Health and Human Services) (2005). Dietary guidelines for americans. Retrieved December 15, 2006, from www.healthierus.gov/dietaryguidelines.

Welsh J.A., Cogswell M.E., Rogers S., Rockett H., Mei Z., Grummer-Strawn L.M. (2005). Overweight among low-income preschool children associated with the consumption of sweet drinks: Missouri, 1999-2002. *American Journal of Pediatrics, 115,* 223-229.

21CFR101.22, Code of Federal Regulations (2002). *U.S. Government Printing Office via GPO Access*, Title 21, Volume 2. Retrieved December 15, 2006, from www.cfsan.fda.gov/~lrd/ CF101-22.HTML.

## ACKNOWLEDGMENTS

We would like to thank Lisa Craypo of Samuels & Associates for generating the study idea and for assistance with methods and review. We thank Marion Nestle for her early review. The content is the final responsibility of the authors.